1  JODI LINKER, Bar Number 230273
   Federal Public Defender
2  Northern District of California
   ANGELA CHUANG, Bar Number 313445
3  Assistant Federal Public Defender
   19th Floor Federal Building - Box 36106
4  450 Golden Gate Avenue
   San Francisco, CA 94102
5  Telephone:   (415) 436-7700
   Facsimile:   (415) 436-7706
6  Email:       Angela_Chuang@fd.org

7

8  Counsel for Defendant Moncada-Flores

9

10            IN THE UNITED STATES DISTRICT COURT

11        FOR THE NORTHERN DISTRICT OF CALIFORNIA

12               SAN FRANCISCO DIVISION

13

14  UNITED STATES OF AMERICA,          **Case No.:** CR 23–337 JD

15            Plaintiff,                **DEFENDANT'S SENTENCING**
                                        **MEMORANDUM**
16       v.
                                        **Court:**        Courtroom 11, 19th  Floor
17  JULEISY MONCADA-FLORES,            **Hearing Date:**  August 26, 2024
                                        **Hearing Time:**  10:30 a.m.
18            Defendant.

19

20

21

22

23

24

25

26

27

28

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

ARGUMENT .................................................................................................................. 2

    I.    Ms. Moncada-Flores' Objections To The PSR ................................................ 2

        A.    Objection Number One: The Offense Conduct description in Paragraph 7 is misleadingly phrased and does not accurately convey what happened ............... 2

        B.    Objection Number Two: The aggravating role adjustment under § 3B1.1(c) and the enhancement under § 3D1.1(b)(16)(B)(i) should not apply, and thus, Ms. Moncada-Flores is entitled to a two-level safety valve reduction as well as a two-level zero-point offender reduction in the Offense Level ............................ 3

            1.    The § 3B1.1(c) role adjustment and the § 3D1.1(b)(16)(B)(i) enhancement should not apply ................................................................. 3

            2.    Ms. Moncada-Flores should receive a two-level safety valve reduction under § 2D1.1(b)(18) as well as a two-level zero-point offender reduction under § 4C1.1 ............................................................ 6

    II.    A Sentence of Time Served—The Equivalent of A 14-Month Sentence—Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of §3553(a) ...................................................................................................... 7

        A.    The nature and circumstances of the offense ........................................ 8

        B.    Ms. Moncada-Flores' history and characteristics ................................. 9

            1.    Ms. Moncada-Flores' personal background ........................... 9

            2.    Ms. Moncada-Flores' future ................................................. 14

CONCLUSION ............................................................................................................. 16

1

# TABLE OF AUTHORITIES

2

## Federal Cases

3
*Gall v. United States*,
4
    558 U.S. 38 (2007) ........................................................................................ 8

5
*Kimbrough v. United States*,
    128 S. Ct. 558 (2007) ................................................................................... 7

6

7
*Rita v. United States*,
    551 U.S. 338 (2007) ..................................................................................... 8

8

9
*United States v. Ameline*,
    409 F.3d 1073 (9th Cir. 2005) ..................................................................... 3

10
*United States v. Avila*,
    95 F.3d 887 (9th Cir. 1996) ......................................................................... 3

11

12
*United States v. Booker*,
    543 U.S. 220 (2005) ................................................................................ 7, 7-8

13

14
*United States v. Carty*,
    520 F.3d 984 (9th Cir. 2008) ....................................................................... 7

15
*United States v. Hatcher*,
16
    414 Fed.Appx. 944 (9th Cir. 2011) .............................................................. 3

17
*United States v. Holden*,
    908 F.3d 395 (9th Cir. 2018) ............................................................... 3-4, 4, 5

18

19
*United States v. Mares-Molina*,
    913 F.2d 770 (9th Cir. 1990) ..................................................................... 3, 5

20

21
*United States v. Parker*,
    214 F.3d 1114 (9th Cir. 2001) ..................................................................... 4

22
*United States v. Whitney*,
    673 F.3d 965 (9th Cir. 2012) ....................................................................... 3

23

24

## United States Sentencing Guidelines

25
U.S.S.G. § 2D1.1 ...............................................................................3, 5, 5-6, 6

U.S.S.G. § 3B1.1................................................................................*passim*

26
U.S.S.G. § 3B1.4...............................................................................................4

27
U.S.S.G. § 3D1.1 ...............................................................................................3

U.S.S.G. § 4C1.1 ...................................................................................6, 6-7, 7

28
U.S.S.G. § 5C1.2 ...............................................................................................6

**Federal Statute**

18 U.S.C. § 3553 .................................................................................................................... *passim*

**Other Authorities**

*February 2024: The Manipulative "Romance" of Grooming & Love Bombing*, Domestic Violence Support Network (Feb. 20, 2024) *available at* https://www.dvsn.org/february-2024-the-manipulative-romance-of-grooming-love-bombing/ ................................................................................. 11

*Five Things About Deterrence*, Nat'l Institute of Justice (June 5, 2016), *available at* https://nij.ojp.gov/topics/articles/five-things-about-deterrence#addenda ................................ 15

*Justice Department Recognizes Human Trafficking Survivor and Advocate from Washington with Special Courage Award*, Dept. of Justice (Apr. 29, 2022), *available at* https://www.ojp.gov/files/archives/pressreleases/2022/doj-recognizes-human-trafficking-survivor-and-advocate* ................................................................................................................ 13

World Report 2024: Honduras, Human Rights Watch, *available at* https://www.hrw.org/world-report/2024/country-chapters/honduras. .......................................................................... 10

1

2

3       **INTRODUCTION**

4       The arc of Juleisy Moncada-Flores' young life thus far has been repeatedly punctuated by

5 exploitation, abuse, and the utter failure of support systems that should have protected her from harm.

6 She is only 22 years old now, but has already weathered and somehow managed to survive far more

7 challenging and traumatic experiences than many people go through in an entire lifetime. In the midst

8 of those obstacles, she also became a mother at the age of 15 and had her second child when she was

9 19. She has effectively been the only parent these children have ever known, and has had to raise

10 them largely on her own without much support. Throughout her life, those closest to her who she

11 should have been able to count on instead let her down or abandoned her. Or even worse, they

12 actively abused her and forced her to do things that she did not want to do—whether that was having

13 sex or selling drugs to pay off other people's debts. It is the latter involvement in selling drugs on the

14 street that brings her before this Court on her first and only criminal conviction whatsoever. When

15 this offense occurred, she was mired in an abusive relationship with a drug dealer who screamed at

16 her, beat her, and put her and her children's lives at risk by stealing from his suppliers and leaving

17 Ms. Moncada-Flores on the hook for it. Because of everything she has been through, she qualifies for

18 immigration relief in the form of a T-visa as a victim of human trafficking, the application for which

19 will be filed shortly after this memorandum and will be pending by the time of sentencing.

20       Nonetheless, even despite these surrounding extenuating circumstances, Ms. Moncada-Flores

21 takes responsibility for her actions and understands that what she did was wrong. She deeply regrets

22 ever selling drugs and has tried to do what she can to atone for her actions while incarcerated in this

23 matter. ██████████████████████████████████████████████████████████

24 ██████████████████████████████████████████████████

25 ██████████████████████████████████████████████████████

26 ████████████████████████. And she is committed to do what she has to in order to overcome

27 the traumas of her past so that she never finds herself in a similar situation again. During Ms.

28 Moncada-Flores' time in jail, she has committed to bettering herself and has availed herself of

whatever programming is accessible to her. She maintains contact when possible with her children,

who have been in foster care for the past year, and is determined to regain custody of them after her

1   release; to do so, she will be required to engage with various services and programs that will be

2   monitored by her CPS social worker and by a Dependency Court judge. Not only that, but she has

3   been working with her defense team to develop a comprehensive reentry plan to supplement her

4   Dependency Court programming that is tailored to her specific needs and interests. Such a plan, in

5   conjunction with the resources of U.S. Probation, would be far more effective than a protracted

6   custodial sentence in providing the structured support and access to services to ensure that Ms.

7   Moncada-Flores leads a law-abiding life and has no future involvement in the criminal justice system.

8   These supportive services are something that she never had in the past in all of the time leading up to

9   the charged offense, and will be crucial in helping her not only to process the deep trauma that she

10   has suffered but also to preventing her from falling prey to exploitation like she has in the past.

11       Ms. Moncada-Flores respectfully requests that the Court impose a sentence of time served—the

12   equivalent of the serving time for a 14-month sentence—to be followed by three years of supervised

13   release. Such a sentence is appropriate based on the factors delineated in 18 U.S.C. § 3553(a).

14   **ARGUMENT**

15   **I.   Ms. Moncada-Flores' Objections To The PSR**

16       As noted in the addendum to the Presentence Report ("PSR"), there remain several unresolved

17   objections to the PSR. *See* PSR Addendum ¶¶ 2–5. Ms. Moncada-Flores supplements those

18   objections below.

19       **A.   <u>Objection Number One</u>: The Offense Conduct description in Paragraph 7 is misleadingly phrased and does not accurately convey what happened**

20

21       Ms. Moncada-Flores maintains her objection to the PSR's assertion in Paragraph 7 that she

22   "instructed her sister to facilitate the sales transaction with the UC." PSR ¶ 7. To begin with, people

23   simply do not speak this way. It is clear that this phrasing represents the SFPD's gloss on the

24   interaction rather than a description of what actually occurred, which creates a misleading

25   impression. Ms. Moncada-Flores contends that this statement should be amended to reflect what

26   actually happened. Namely, she asked her sister if she had "yellow" for the UC. This description also

27   comports with the government's description of the same interaction, the recitation of which does not

28   mention Ms. Moncada-Flores instructing her sister to facilitate a sales transaction. Dkt No. 44 (Govt

Sentencing Memo) at 2. Accordingly, the Court should order Probation to amend Paragraph 7 so that

1    it accurately reflects what actually happened.

2        **B.    <u>Objection Number Two:</u> The aggravating role adjustment under § 3B1.1(c) and
         the enhancement under § 3D1.1(b)(16)(B)(i) should not apply, and thus, Ms.
3        Moncada-Flores is entitled to a two-level safety valve reduction as well as a two-
         level zero-point offender reduction in the Offense Level**
4

5            **1.    The § 3B1.1(c) role adjustment and the § 3D1.1(b)(16)(B)(i) enhancement
                     should not apply**

6        One of the basic requirements for the § 2D1.1(b)(16)(B)(i) enhancement to apply is the

7    application of an aggravating role adjustment under § 3B1.1. The role adjustment under § 3B1.1(c)

8    should not apply in this case. Circumstances justifying an upward departure must be proven by a

9    preponderance of the evidence. *United States v. Mares-Molina*, 913 F.2d 770, 773 (9th Cir. 1990).

10   "In determining whether to apply a sentencing enhancement, a court may not rely exclusively upon

11   disputed factual statements in the presentence report ("PSR")." *United States v. Hatcher*, 414

12   Fed.Appx. 944, 946 (9th Cir. 2011) (unpublished) (citing *United States v. Ameline*, 409 F.3d 1073,

13   1085–86 (9th Cir. 2005)). That burden has not been met here, as the government has not proven that

14   Ms. Moncada-Flores exercised the requisite control or organizational authority over her sister.

15   Rather, they were co-equal participants in the crime.

16       The Ninth Circuit repeatedly has made clear that to impose a role adjustment under § 3B1.1,

17   "there must be evidence that the defendant exercised some control over others involved in the

18   commission of the offense or was responsible for organizing others for the purpose of carrying out

19   the crime." *United States v. Avila*, 95 F.3d 887, 889 (9th Cir. 1996); *United States v. Mares-Molina*,

20   913 F.2d at 773; *see United States v. Whitney*, 673 F.3d 965, 975 (9th Cir. 2012) ("Under this

21   circuit's clear articulation of § 3B1.1(c), even a defendant with an important role in an offense cannot

22   receive an enhancement unless there is a showing that the defendant had control over others.")

23   (internal quotations and citation omitted). "Mere *facilitation* of criminal activity is not sufficient to

24   support the enhancement." *United States v. Holden*, 908 F.3d 395, 402 (9th Cir. 2018) (finding that

25   enhancement cannot apply where defendant and co-conspirator were "co-equal" conspirators, even

26   where defendant gave co-conspirator instructions for sending investor funds to defendant's bank

27   account, because otherwise, "nearly every co-conspirator in a limited conspiracy of equals would be

28   an 'organizer' of his or her comrades, and . . . [s]uch a result is inconsistent with the main purpose of

the 'organizer' enhancement . . . .").

    Here, there is no evidence that Ms. Moncada-Flores exercised any control over her sister or organized her sister's participation in the offense. They helped each other sell drugs as co-equal participants, much like the defendants in *Holden*. There is no evidence that she directed, managed, organized, or controlled her sister's actions in this offense. With regard to the first controlled buy, she asked her sister for the specific drugs that the UC wanted to purchase because Ms. Moncada-Flores did not have that type on herself that day, which is consistent with co-equal participants helping one another. Ms. Moncada-Flores' sister then took the UC's money from her, *see* Dkt. No. 44 at 2, which is utterly at odds with Ms. Moncada-Flores having some sort of supervisory or organizational authority over her; in the usual course, it would be expected that the managers take the money, not the subordinates. At most, they facilitated each other. This is supported by the facts of the second controlled buy, where Ms. Moncada-Flores completed the entire transaction by herself; though her sister was present that day as well, she did not participate at all in that purchase. In short, the facts "do[] not support the conclusion that Defendant exercised sufficient control or organizational authority over [her sister] to qualify for the two-level enhancement of § 3B1.1(c)." *Cf. Holden*, 908 F.3d at 403.[1]

    Probation's justification for application of the role adjustment is unsupported by law and by the evidence. They claim that the role adjustment is warranted because Ms. Moncada-Flores is the older sister, so she "naturally has some influence over her younger sister's engagement in activities." PSR Addendum ¶ 5. This generalization is insufficient to support a role adjustment under Ninth Circuit law, as laid out above. Basing the adjustment largely on the existence of a personal or familial relationship and the vague inference that such a relationship means that one person "naturally has

---

[1] For the same reasons, an enhancement under § 3B1.4 is not supported by the facts. Ms. Moncada-Flores did not "use" her sister to commit the offense; they were merely partners at most. *Cf. United States v. Parker*, 214 F.3d 1114, 1120–21 ("We hold that a defendant's participation in an armed bank robbery with a minor does not warrant a sentence enhancement under § 3B1.4 in the absence of evidence that the defendant acted affirmatively to involve the minor in the robbery, beyond merely acting as his partner. Here there was no such evidence: The district court's finding was that Parker and Baylon were merely co-conspirators. The fact that Defendant was the minor's partner and profited from his participation in the crime does not show that he acted affirmatively to involve Baylon.").

DEF'S SENT. MEM.
*MONCADA-FLORES*, CR 23–337 JD

1   some influence" over the other as a general matter is nowhere to be found in the applicable law. What

2   must be proven for an aggravating role adjustment is a defendant's control or responsibility for

3   organizing others **in the commission of the offense**. *See Mares-Molina*, 913 F.2d at 773. And

4   sufficient evidence of that specific requirement has not been shown here. The purported evidence that

5   Probation relies upon to justify the adjustment do not support their conclusion. The fact that Ms.

6   Moncada-Flores and her sister lived together does not prove anything about their respective roles in

7   the offense. Nor does the fact that Ms. Moncada-Flores' sister was a minor at 16 years old,[2] as that

8   offers no actual proof of the requisite control or organizational authority with respect to commission

9   of the offense. Living together, the existence of a familial relationship, and the fact that her sister was

10   16 years old is simply insufficient to trigger an aggravating role adjustment. Neither Probation nor

11   the government has cited any authority saying otherwise.

12          Finally, Probation's reliance on what happened during the two controlled buys in this matter is

13   misplaced. As explained above, those interactions show at most that Ms. Moncada-Flores and her

14   sister worked together to sell drugs as co-equal participants. Also explained above, it is insufficient to

15   rely upon the conclusory—and disputed—characterization that Ms. Moncada-Flores "instruct[ed] her

16   sister to further facilitate the transaction" as proof of control when the underlying facts, as the

17   government's own sentencing memorandum lays out, do not support that conclusion. Not only that,

18   but the Ninth Circuit has held that giving instructions to a co-conspirator is insufficient to support a

19   role adjustment under § 3B1.1. *Holden*, 908 F.3d at 402 ("The Government argues that the two-level

20   enhancement is proper nonetheless because Defendant gave Sharp 'instructions for sending investors'

21   funds to accounts [Defendant] controlled in Ghana.' We think that act is best characterized as

22   'facilitation' rather than 'organization'. . . . The record does not support the conclusion that

23   Defendant exercised sufficient control or organizational authority over Sharp to qualify for the two-

24   level enhancement of § 3B1.1(c).").

25          Because the aggravating role adjustment should not apply, the enhancement under §

26   2D1.1(b)(16)(B)(i) cannot apply either. *See* U.S.S.G. § 2D1.1(b)(16) (requiring an aggravating role

27

28

---

[2] Ms. Moncada-Flores herself was also young (21) at the time of the offense.

1 | adjustment before application of any of its subdivisions). Even aside from that, the enhancement fails

2 | on an independent basis, there is no evidence that Ms. Moncada-Flores "involved" her sister in the

3 | offense. Her sister was introduced to the drug trade not through Ms. Moncada-Flores, but rather

4 | through her sister's now-ex boyfriend. By the time of the investigation in this case, Ms. Moncada-

5 | Flores' sister had already been selling drugs independently of Ms. Moncada-Flores for quite a while.

6 | She had her own suppliers that were different than Ms. Moncada-Flores' sources. As an example,

7 | prior to this offense, Ms. Moncada-Flores' sister had been previously arrested for selling drugs with a

8 | young man in February 2023 during an incident that did not involve Ms. Moncada-Flores. *See*

9 | Declaration of Angela Chuang in Support of Defendant's Sentencing Memorandum ("Chuang

10 | Decl."), Ex. A (2.11.23 Police Report).

11 |      Accordingly, the Court should not apply the role adjustment under § 3B1.1(c) or the

12 | enhancement under 2D1.1(b)(16)(B)(i).

13 |     **2.**    **Ms. Moncada-Flores should receive a two-level safety valve reduction under § 2D1.1(b)(18) as well as a two-level zero-point offender reduction under**

14 | **§ 4C1.1**

15 |      Defendants who meet the requirements for safety valve relief, as laid out in 18 U.S.C. § 3553(f)

16 | and reiterated in the Guidelines at § 5C1.2, are entitled to a two-level Offense Level reduction. *See*

17 | U.S.S.G. § 2D1.1(b)(18). The only point of contention as to Ms. Moncada-Flores' eligibility for this

18 | reduction is whether she was or was not "an organizer, leader, manager, or supervisor of others in the

19 | offense, as determined under the sentencing guidelines."[3] U.S.S.G. § 5C1.2(4). Ms. Moncada-Flores

20 | has explained above why such a role adjustment does not apply in her case. Accordingly, she is

21 | eligible and should receive a 2-level reduction under § 2D1.1(b)(18).

22 |      Similarly, one of the requirements for application of a two-level zero-point offender reduction

23 | under § 4C1.1 is that the defendant did not receive an aggravating role adjustment under § 3B1.1 *See*

24 |

25 | _____

26 | [3] Undersigned counsel has not seen any indication that there is a dispute as to whether Ms. Moncada-Flores meets the other requirements, which she does. She (1) does not have more than 4 criminal

27 | history points, *see* PSR ¶ 42; (2) did not use violence or threats or violence, or possess a gun or other dangerous weapon in connection with the offense; (3) did not commit an offense that resulted in

28 | death or serious bodily injury to any person; ████████████████████████████████
████████████████████████████████████████████

U.S.S.G. § 4C1.1(1)(10). That is also the sole point of contention as to Ms. Moncada-Flores' eligibility for this reduction.[4] Because the § 3B1.1 role adjustment should be not apply in her case, she should receive a 2-level reduction under § 4C1.1 for being a zero-point offender.

## II.    A Sentence of Time Served—The Equivalent of A 14-Month Sentence—Would Be Sufficient But Not Greater Than Necessary To Achieve The Sentencing Goals Of  § 3553(a)

In sentencing Ms. Moncada-Flores, this Court must consider all of the directives set forth in 18 U.S.C. § 3553(a); the Guidelines are only one factor among many to be considered by the Court. *See United States v. Booker*, 543 U.S. 220 (2005); *Kimbrough v. United States*, 128 S. Ct. 558, 570 (2007). "The overarching statutory charge for a district court is to impose a sentence sufficient, but not greater than necessary" to achieve the goals of § 3553(a). *United States v. Carty*, 520 F.3d 984, 991 (9th Cir. 2008) (internal quotations omitted). Those goals include the need to: (1) reflect the seriousness of the offense; (2) promote respect for the law; (3) provide just punishment for the offense; (4) afford adequate deterrence to criminal conduct; (5) protect the public from further crimes of the defendant; and (6) provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner. *See* 18 U.S.C. § 3553(a)(2). Section 3553(a) also directs the Court to consider additional factors, including: the nature and circumstances of the offense, § 3553(a)(1); the history and characteristics of the defendant, § 3553(a)(1); the kinds of sentences available, § 3553(a)(3); the sentencing Guideline range, § 3553(a)(4); pertinent Sentencing Commission policy statements, § 3553(a)(5); the need to avoid unwarranted sentencing disparities, § 3553(a)(6); and the need to provide restitution to any victims of the offense, § 3553(a)(7).

Under *Booker*, the sentencing court must impose the lowest reasonable sentence that fulfills the

---

[4] The other criteria that Ms. Moncada-Flores meets are: (1) zero criminal history points; (2) no adjustment pursuant to §3A1.4 (Terrorism); (3) no use of violence or credible threat of violence in connection with the offense; (4) no death or serious bodily injury resulting from the offense; (5) offense of conviction is not a sex offense; (6) did not personally cause substantial financial hardship; (7) did not possess, receive, purchase, transport, transfer, sell, or otherwise dispose of a firearm or other dangerous weapon, or induce another participant to do so, in connection with the offense; (8) offense of conviction is not covered by §2H1.1 (Offenses Involving Individual Rights); and (9) no adjustment under § 3A1.1 (Hate Crime Motivation or Vulnerable Victim) or § 3A1.5 (Serious Human Rights Offense). U.S.S.G. § 4C1.1.

goals of Congress, unencumbered by offense levels, criminal history, or the availability of authorized downward departures. While the Court may apply a presumption of reasonableness to sentences within the applicable Guidelines range, the district court "does not enjoy the benefit of a legal presumption that the Guidelines sentence should apply." *Rita v. United States*, 551 U.S. 338, 351 (2007). Nor is it required to use a formulaic approach yielding a mathematical justification of non-Guidelines sentences. *See Gall v. United States*, 558 U.S. 38, 49 (2007). Rather, it must exercise "reasoned sentencing judgment, resting upon an effort to filter the Guidelines' general advice through § 3553(a)'s list of factors." *Rita*, 551 U.S. at 358.

Ms. Moncada-Flores agrees that her Criminal History Category ("CHC") is I based on zero criminal history points. *See* PSR ¶ 42. She disputes the PSR's calculation of a final Offense Level of 27, as discussed above and in the PSR Addendum. *See* PSR Addendum ¶¶ 2–5. The PSR's resulting advisory Guidelines range is 70–87 months. *Id.* ¶ 67. If the Court sustains Ms. Moncada-Flores' objections to the Offense Level calculation and correspondingly applies a two-level safety valve reduction and a two-level zero-point offender reduction, the final offense level would be 19 and the resulting advisory Guidelines range would be 30–37 months.

### A. The nature and circumstances of the offense

On July 13, 2023, Ms. Moncada-Flores and her sister sold $40 worth of fentanyl to an undercover officer who had approached them in the street in the Tenderloin. PSR ¶ 7. Roughly a week later, the UC contacted Ms. Moncada-Flores to arrange another drug purchase, which she conducted on her own. *See* PSR ¶ 10. This sale involved 3.79 grams of fentanyl and 27.22 grams of meth. *Id.* Law enforcement subsequently obtained a search warrant, which they executed on August 22, 2023, at her residence, where they recovered additional drugs. *Id.* ¶¶ 18, 20. The UC had contacted Ms. Moncada-Flores to arrange another purchase that same day, and she was arrested when she went to the meeting spot. *Id.* Upon searching her, officers found meth and fentanyl that the UC had requested. *Id.* Her son was in the car with her; she did not normally bring either of her children with her, but she had been unable to find someone who could babysit him that day and she did not want to leave him alone at home.

Ms. Moncada-Flores has taken responsibility for her criminal conduct and deeply regrets her

involvement in the drug trade. She understands that circulating these substances, particularly

fentanyl, can have serious and tragic consequences. Ms. Moncada-Flores does not disagree with that

premise nor does she seek to excuse or justify her own conduct in selling drugs. ███████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

███████████████

     It is important to also consider the reality of her relative culpability in the context of the

broader fentanyl epidemic. Ms. Moncada-Flores was a low-level dealer who sold drugs on the street

and who had herself fallen prey to substance abuse issues. She was not a drug kingpin or anything

close to that level in the distribution chain. And the greater surrounding context of what was

happening in her personal life makes clear that the circumstances underlying her drug dealing were

extreme and coercive. This investigation and arrest occurred when she was at a low point in her life,

beaten down literally and figuratively by a long history of trauma, including a series of abusive

partners who exploited her vulnerabilities as a young single mother trying to survive with essentially

no support in a different country than her own. Her then-boyfriend, Javier Flores (aka Edwin), made

her sell drugs to repay his debts and punished her with physical, verbal, and emotional abuse if she

did not do what he wanted. *See* PSR ¶ 52. At the same time, her ex-partner and the father of her

younger child, who had abused and raped her during the course of their relationship, continued to

harass her and her family even after his imprisonment by calling to demand money from them and

threatening to kill them if they did not comply. *See id.* Ms. Moncada-Flores turned her anguish at her

untenable situation inwards, punishing herself by cutting herself and abusing drugs and alcohol. *Id.*

¶¶ 59–60. It was at this nadir in her life that she committed the instant offense.

### B.    Ms. Moncada-Flores' history and characteristics

#### 1.    Ms. Moncada-Flores' personal background

     As laid out in the PSR, the 22 years of Ms. Moncada-Flores' life have been anything but stable.

During her childhood in Honduras, domestic abuse between her parents as well as directed towards

her was a regular occurrence. PSR ¶ 51. Both parents mentally and physically abused her. *Id.* Her

father, who struggled with an addiction to drugs and alcohol himself, would hit her with a belt and pull her hair for something as minor as not getting good enough grades in school to satisfy him. *Id.* The end result was that Ms. Moncada-Flores spent her formative years in an environment where her victimization was not only accepted, but in fact inflicted, by those who should have protected her. And it did not stop there. Ms. Moncada-Flores was sexually molested at the age of six, the authorities also let her down by failing to arrest or prosecute the man who had fondled her. *Id.* ¶ 52. This type of gender-based violence and mistreatment has tragically permeated her life and has repeated itself in various different relationships with men who controlled and dominated her. Her first relationship was with a 25-year-old man when she herself was only 14—barely in her teens. *Id.* ¶ 53. He abandoned her after impregnating her. *Id.* Instead of providing her with the support she desperately need, her parents instead scorned and humiliated her, calling her an embarrassment to the family and telling her that she would never amount to anything. *Id.* She was only 15 when she became a mother for the first time.

Things were not much better outside the household, as unchecked violence is endemic to living in Honduras.[5] At the age of 11, Ms. Moncada-Flores' grandfather was violently murdered and her father was shot by gang members. *Id.* It was after this traumatic loss that Ms. Moncada-Flores first began engaging in self-harm by cutting her arms. *Id.* The impending threat of gang violence also played a part in her decision to move to the United States, a move she made after a gang member threatened to kidnap her. *Id.* But her problems were not solved by relocating to the U.S. Over the course of the next several years, the same pattern of neglect by those close to her and exploitation by abusive, overbearing partners surfaced again. To begin with, her aunt who she lived with for some time in Houston allowed Ms. Moncada-Flores to be kicked out of the house with nowhere to go simply because her uncle did not approve of the fact that she was working at a nightclub. *Id.* ¶ 54. So it was that she found herself alone as a teenager with an infant—and without housing, a reliable income, or any real support network to speak of—in an unfamiliar country where she did not speak

---

[5] Honduras is considered one of the most violent countries in the world, as measured by homicide rate. *See* World Report 2024: Honduras, HUMAN RIGHTS WATCH, *available at* https://www.hrw.org/world-report/2024/country-chapters/honduras.

1    the language. It is a small miracle that they survived.

2          But that survival came with a steep price. Much of the last several years of Ms. Moncada-

3    Flores' life in the Bay Area has been spent in one of two significant relationships with men who

4    claimed to support her only to exploit and abuse her in various ways. Like many abusive

5    relationships, these both began with love bombing to draw her in before they devolved into toxic

6    behaviors and egregious domestic violence. *See February 2024: The Manipulative "Romance" of*

7    *Grooming & Love Bombing*, DOMESTIC VIOLENCE SUPPORT NETWORK (Feb. 20, 2024) ("Love

8    bombing is a tactic frequently employed by abusers to groom victims by using acts of 'love,' such as

9    over the top attention and affection, to influence them . . . . The grooming process can leave victims

10   extremely vulnerable, unable to trust their own feelings and instincts . . . . It also makes it extremely

11   difficult to leave the relationship, even when they know it is not a healthy one.").[6] Her first abusive

12   partner was Arnaldo Martinez, who physically abused her and regularly raped her throughout the

13   course of her relationship. PSR ¶ 52. He is the father of her younger child, who was born when Ms.

14   Moncada-Flores was 19, though Ms. Moncada-Flores has raised their son essentially on her own. *See*

15   *id.* Mr. Martinez eventually was sent to federal prison on drug charges, but that did not stop him from

16   continuing to harass and threaten Ms. Moncada-Flores and her family from afar to demand that they

17   give him money. *See id.*; *see also* Chuang Decl., Ex. B (Audio Messages) & Ex. C (Translation of

18   Audio Messages).[7]

19          Her second abusive partner was Javier (aka Edwin) Flores, her boyfriend at the time of her

20   arrest and the man who pushed her into selling drugs for him. Like his predecessor, Mr. Flores

21   abused and controlled Ms. Moncada-Flores through physical violence. PSR ¶ 57. If she did not do

22   what he wanted her to do (i.e., selling drugs in the street or bringing drugs to him in Sacramento), he

23   would scream at her, beat her, and break her belongings. *Id.* Her sister often witnessed portions of

24   these fights, as Ms. Moncada-Flores would seek refuge in her room; that did not always work,

25   however, as Mr. Flores would break into the room and drag Ms. Moncada-Flores out by her arm or

26

27   _____

28   [6] Available at https://www.dvsn.org/february-2024-the-manipulative-romance-of-grooming-love-
     bombing/.
     [7] The messages that are being submitted to the Court were received in the spring of 2023.

DEF'S SENT. MEM.
*MONCADA-FLORES*, CR 23–337 JD

1    hair. *See* Declaration of Michael Portman ("Portman Decl.") ¶¶ 3–4. In one instance, Ms. Moncada-

2    Flores went to the ER after Mr. Flores attacked her in front of her children and bit her face, neck and

3    ear. *See* Chuang Decl., Ex. D (Highland Hospital Records) (documenting an ER visit for domestic

4    violence injuries). Ms. Moncada-Flores and her sister called the Oakland police several times, but

5    Mr. Flores always escaped out a window before they arrived. PSR ¶ 3; *see* Chuang Decl., Ex. D

6    (Highland Hospital Records) (noting that OPD took a report but that Ms. Moncada-Flores' partner

7    had fled the scene). It does not appear that Mr. Flores was ever arrested or prosecuted for any of these

8    domestic violence incidents, which only served to reinforce the notion that the authorities could not

9    help Ms. Moncada-Flores. In addition to the rampant abuse, Mr. Flores also put Ms. Moncada-Flores

10   and her children at risk by stealing drugs from his suppliers and leaving her on the hook for his debt.

11   PSR ¶ 52. His suppliers sent people to Ms. Moncada-Flores' home who threatened to kill her and her

12   children if she not repay Mr. Flores' debt. *Id.*; *see* Portman Decl. ¶¶ 7–8 (describing her sister's

13   recollections of such visits).

14          This was the disturbing state of Ms. Moncada-Flores' life in the years and months leading up to

15   the instant offense. She felt that she had no realistic choice but to sell drugs not only in the hopes of

16   preventing Mr. Flores from hurting her, but also to try to pay off his debts to his suppliers who had

17   directly threatened her and her children's lives. On top of that, Mr. Martinez was threatening her and

18   her family unless they sent him money as well. It was too much for her to take. She began drinking

19   excessively, using crack cocaine every weekend, and cutting herself again in search of relief. *See*

20   PSR ¶¶ 59–60.

21          Due to Ms. Moncada-Flores' experiences, she has been identified as a victim of human

22   trafficking. *See* PSR ¶ 56; Chuang Decl., Ex. E (Justice at Last Letter) ¶¶ 6–9. As the State

23   Department has recognized, victims of trafficking are often forced to commit crimes but "law

24   enforcement authorities often fail to properly screen and identify victims of human trafficking when

25   they detain or arrest criminal suspects." Chuang Decl., Ex. E (Justice at Last Letter) ¶ 10. Fortunately

26   for Ms. Moncada-Flores, it is now clear that she is a survivor of human trafficking as well as of

27   domestic violence. She qualifies for immigration relief in the form of a T-visa, the application for

28   which her immigration attorney intends to file next week.

1    Unsurprisingly, the extensive trauma that Ms. Moncada-Flores has endured has had significant

2    impacts on her mental state and her cognitive functioning. She was recently assessed by Dr. Suamhirs

3    Piraino-Guzman, an internationally-recognized trafficking expert, behavioral neurologist, and clinical

4    psychologist who specializes in working with victims of trafficking. *See* Chuang Decl., Ex. F (Dr.

5    Piraino-Guzman Psych Report) at 1. A survivor of child sex trafficking himself, Dr. Piraino-Guzman

6    has vast experience and expertise in the anti-trafficking field, including previously serving as the UN

7    Special Rapporteur on Labor and Sexual Exploitation of Children.[8] *See id.* Undersigned counsel will

8    highlight only some of Dr. Piraino-Guzman's assessment in this memorandum, but his full analysis

9    and the bases therefor are set out in great detail in his full report that is being submitted to the Court

10   for review. Following extensive testing, multiple clinical interviews, and review of records, Dr.

11   Piraino-Guzman concluded the following:

12          Juleisy Moncada Flores has endured severe psychological trauma due to
13          prolonged and complex physical abuse and labor trafficking. This trauma
            has manifested in a range of debilitating symptoms. ██████████████
14          ████████████████████████████████████████████████████████ and
            significant cognitive impairments. The neurobiological impact of her
15          trauma is evident in the dysfunction of multiple brain areas, including the
            amygdala, prefrontal cortex, hippocampus, and anterior cingulate cortex.
16          These symptoms have severely affected her emotional regulation,
            cognitive functioning, physical health, and ability to form and maintain
17          relationships.

18          Juleisy's compounded, severe, and inhumane experience of human
            trafficking has resulted in the severe manifestation of trauma-based
19          neurological injury to the Amygdala, Prefrontal Cortex, hippocampus,
            anterior cingulate cortex, insular cortex, thalamus, and hypothalamus.
20          This severe damage and its resulting symptoms are psychological
            manifestations and confirm the legal evaluation of human trafficking.

21   *Id.* at 9. As Dr. Piraino-Guzman notes, "Tragically, Juleisy is one of countless victims of severe

22   human trafficking who have fallen through the cracks of our community protection systems until they

23   are arrested." *Id.* at 10. Ultimately, what this all means is that Ms. Moncada-Flores' commission of

24   the instant offense was the culmination of years of trauma and abuse that broke her down physically,

25

26   _____

27   [8] In 2022, DOJ honored Dr. Piraino-Guzman with the Special Courage Award for his efforts to
     combat human trafficking. *See Justice Department Recognizes Human Trafficking Survivor and
     Advocate from Washington with Special Courage Award*, DEPT. OF JUSTICE (Apr. 29, 2022),
28   *available at* https://www.ojp.gov/files/archives/pressreleases/2022/doj-recognizes-human-trafficking-
     survivor-and-advocate.

1   mentally, and emotionally. Her victimization is not being presented to this Court as a justification for

2   her conduct, but rather as a way to contextualize it and to provide valuable insight into the extreme

3   circumstances that pushed her to do what she did—circumstances that are unlikely to recur once she

4   has access to the supportive services that she never had in the past.

5                           **2.      Ms. Moncada-Flores' future**

6          So where does Ms. Moncada-Flores go from here? It is by no means certain that she would be

7   deported following conclusion of the instant criminal case. As previously noted, by the time of

8   sentencing, she is eligible for a T-visa and will have a pending T-visa application that could provide

9   her a way to remain and work lawfully in the U.S. Both of her children are here in the Bay Area and

10  have been in foster care for the past year since her arrest. PSR ¶ 55. CPS proceedings are ongoing in

11  Dependency Court. *Id.* The CPS social worker assigned to her case has informed defense counsel that

12  her case is on a family reunification track, which will require her to participate in court-ordered

13  programming—such as parenting classes, substance use classes and/or treatment, drug testing—with

14  the end goal being reunification of the family once the Dependency Court judge deems it appropriate.

15  *See* Chuang Decl. ¶ 2. A years-long prison sentence would significantly interfere with the

16  Dependency Court's plan for reunification and stability in her children's lives.

17         Significantly, Ms. Moncada-Flores has already begun her rehabilitation by participating in the

18  programming that is available to her at Santa Rita Jail. This includes parenting classes as well as

19  courses to develop concrete, practical skills (such as ESL) that will provide a foundation for her to

20  enter the workforce and contribute to society. *See* Chuang Decl., Ex. G (Certificates and Progress

21  Reports). She is committed to improving herself so that she can move forward from her past and be

22  the best mother to her children that she possibly can be. Indeed, reunifying with her children is her

23  most fervent wish, especially since she has now been separated from them for a year. This time apart

24  from her children has been incredibly difficult for her; having experienced that, there is no way she

25  would want to put herself in a situation where they would be separated again in the future. Ms.

26  Moncada-Flores fully understands that she must make substantial adjustments in her life in order to

27  provide them the stability that they deserve. With that in mind, she has worked with her defense team

28  to develop a comprehensive reentry plan that will first address her most basic needs—such as her

release—and connect her to community resources that can help her achieve longer-term educational goals. *See* Chuang Decl., Ex. H (Reentry Plan). For example, her defense team has been in contact with Ruby's Place in Castro Valley, a residential program that specifically serves young women who are survivors of domestic violence and/or human trafficking, and that accordingly, is well-equipped to accommodate her needs. *See id.* This program can provide Ms. Moncada-Flores with support and shelter until she secures a more permanent residence. Not only that, but it offers peer counseling, trauma-informed counseling, case management, and enrollment in social services programs. *Id.* These wrap-around services will be crucial to address her other needs, including mental health treatment that she clearly needs in order to process and address everything that she has been through. Ms. Moncada-Flores has already been receiving mental health treatment and medications while at Santa Rita Jail, *see* PSR ¶ 59, and would like to continue accessing similar services upon her release. She has also been working to mend her relationship with her family in Honduras and to find a way to move past the problems that they had before. *See id.* ¶ 50. In sum, her life following this case will be completely different from what it was before. She will be dialed into the supportive services and network that she never had access to in the years leading up to this offense. That will make all the difference and provide her with the tools necessary to stabilize her and her children's lives. With that in place, she will not be vulnerable to exploitation by abusive, predatory partners like she was before and she is unlikely to make the same mistakes that brought her to this Court.

With regard to deterrence, the government recognizes that Ms. Moncada-Flores has been specifically deterred. Dkt. No. 44 at 1. It argues that a longer prison sentence is necessary for general deterrence purposes. It is a somewhat puzzling statement because it stands in contrast not only with research in the field but also with an article issued by the National Institute of Justice, which is part of DOJ itself. *See Five Things About Deterrence*, NAT'L INSTITUTE OF JUSTICE (June 5, 2016).[9] This article's conclusions were based on review of a "large body of research related to deterrence of crime." *Id.* Particularly relevant here are two points that this body of research has shown: (1) "The *certainty* of being caught is a vastly more powerful deterrent than the punishment"; and (2)

---

[9] Available at https://nij.ojp.gov/topics/articles/five-things-about-deterrence#addenda.

1 | "Increasing the severity of punishment does little to deter crime." *Id.* The government's general

2 | deterrence argument, then, is unsupported by DOJ's own understanding of the research, which

3 | instead shows that increasing severity of punishment (i.e., increasing the length of prison sentences)

4 | has little deterrent effect. The time that Ms. Moncada-Flores has spent in custody while this case has

5 | been pending is enough; no more custodial time is necessary to achieve the goals of sentencing.

6 | ### CONCLUSION

7 | For all the reasons set forth above, Ms. Moncada-Flores respectfully requests that the Court

8 | sustain her objections to the PSR and impose a sentence of time served—the equivalent of a 14-

9 | month sentence—to be followed by three years of supervised release. Such a sentence is sufficient

10 | but not greater than necessary to achieve the sentencing goals laid out in § 3553(a).

Dated:      August 12, 2024                    Respectfully submitted,

JODI LINKER
Federal Public Defender
Northern District of California

/S
ANGELA CHUANG
Assistant Federal Public Defender